**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 1, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CHARLES JAMES LACONA, JR.,

    Defendant - Appellant.

No. 25-1033
(D.C. No. 1:23-CR-00104-DDD-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, **BACHARACH** and **MORITZ**, Circuit Judges.
_____

A jury convicted Charles Lacona of two counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of money laundering in violation of 18 U.S.C. § 1957. He argues that the wire-fraud counts can't stand because the government failed to show the necessary interstate-commerce link and committed plain prosecutorial misconduct. He also argues that one wire-fraud count and the money-laundering count were constructively amended, requiring reversal.

Because we conclude (1) the government presented sufficient evidence of an interstate-commerce connection to support the wire-fraud convictions, (2) the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

government did not constructively amend any count, and (3) the prosecutor did not commit misconduct, we affirm Lacona's convictions.

## Background

The government charged Lacona with two counts of wire fraud stemming from a scheme to defraud the United States and TCF Bank by fraudulently obtaining Paycheck Protection Program (PPP) loans—and attempting to obtain Economic Injury Disaster (EID) loans—on behalf of his Colorado company, National Financial Services, Inc. (NFS). The indictment alleged that the scheme began in "at least April 2020[] and continu[ed] until at least April 2021," comprising two successful PPP applications filed with TCF on April 28, 2020, and January 19, 2021, and two unsuccessful EID applications filed with the Small Business Administration (SBA) between April and August 2020. R. vol. 1, 24. The indictment also charged Lacona with one count of money laundering based on a Cadillac purchase worth more than $10,000.

A jury found Lacona guilty of all three counts. After the verdict, Lacona moved for acquittal, arguing that the government failed to prove the required jurisdictional hook for wire fraud and money laundering because it never proved the "loan funds" moved "across state lines" in the car purchase or the loan disbursement. *Id.* at 718. He also argued that the government did not prove that the wire transactions were part of an "ongoing scheme"; in his view, "[i]f the government proved any scheme, it proved two separate schemes and impermissibly expanded the scope of the [i]ndictment in doing so." *Id.* at 722. He further argued that the

government failed to "prove beyond a reasonable doubt that [he] had actual knowledge that the wires would be used in the ordinary course of business." *Id.* at 726. And he requested acquittal on the money-laundering count on the basis that the predicate wire-fraud counts had not been proven. The district court denied Lacona's acquittal motion, varied downward to impose 24 months in prison and three years of supervised release, and ordered him to pay nearly $550,000 in restitution.

Lacona appeals.

## Analysis

We begin with Lacona's challenge to the sufficiency of the interstate-commerce evidence. We then turn to his constructive-amendment arguments and finally his prosecutorial-misconduct argument.

## I.    Sufficiency of Interstate-Commerce Evidence

Where, as here, a defendant raises a sufficiency argument in a motion after trial and renews it on appeal, our review is de novo. *United States v. Clark*, 717 F.3d 790, 805 (10th Cir. 2013). "[E]vidence is sufficient to support a conviction so long as[,] 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Wire fraud occurs when an individual, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, *transmits or causes to be transmitted*

3

*by means of wire . . .* in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." § 1343 (emphasis added). We have summarized this statutory language into three basic elements: (1) a scheme to defraud or obtain property by falsities, (2) intent to defraud, and (3) an interstate wire communication to carry out the scheme. *United States v. Zander*, 794 F.3d 1220, 1230–31 (10th Cir. 2015). Lacona focuses only on the third element, arguing that a rational trier of fact could not find, beyond a reasonable doubt, that he either transmitted or caused to be transmitted an interstate wire communication.

To show interstate transmission, "the government must prove that the charged 'communications actually crossed state lines.'" *United States v. Baker*, 155 F.4th 1188, 1202 (10th Cir. 2025) (cleaned up) (quoting *United States v. Kieffer*, 681 F.3d 1143, 1153 (10th Cir. 2012)). On this point, "an 'individual's use of the internet, standing alone, does not establish an interstate transmission.'" *Id.* (cleaned up) (quoting *Kieffer*, 681 F.3d at 1155). In *Baker*, for example, the evidence indicated that the defendant used the internet to modify Utah business records. *Id.* at 1190. But the mere fact that the government had proven the Utah business-records website was publicly accessible across state lines was not enough; instead, it had to show that the defendant's communications when accessing the site actually traveled across state lines. *Id.* at 1203. And we found insufficient evidence on that point: it was entirely possible that "the servers used for the communications relevant to [the] charge were 'located in the same state as the computers used to access the website.'" *Id.* (quoting *Kieffer*, 681 F.3d at 1155).

Here, however, the government presented specific evidence to show interstate

transmission. Specifically, the government proved at trial that the fees paid to TCF Bank traveled across state lines. Indeed, Lacona concedes as much, noting that "[t]he [g]overnment admittedly showed that the file for [TCF's] processing fees moved across state lines." Aplt. Br. 16. In the interest of clarity, we detail the supporting evidence. First, an SBA attorney testified at trial "that SBA would pay the lenders a processing fee to reimburse them for the costs of processing the PPP loans." R. vol. 4, 392. Then an investigative analyst for the Bureau of the Fiscal Service testified that the "payment file" associated with the fees "originate[d] from the [SBA], which is located in Denver, Colorado, . . . [was] then transmitted to the Treasury in Kansas City, Missouri, to their servers," was then "sent to the Federal Bank in East Rutherford[,] New Jersey, and from there [was] distributed to" TCF Bank. *Id.* at 654. That is more than sufficient evidence for a reasonable jury to find an interstate wire communication beyond reasonable doubt.

Nevertheless, Lacona did not transmit that specific wire communication. So the government was required to show that Lacona *caused* the interstate wire communication to be transmitted. *See United States v. Weiss*, 630 F.3d 1263, 1271–73 (10th Cir. 2010). To do so, "the government need only prove [the defendant] had knowledge of or could reasonably foresee that his fraudulent [loan] applications would result in the use of a wire communications facility." *Id.* at 1273. Importantly, "[t]he relevant question is not whether [Lacona] knew or could reasonably have foreseen the details of the[] specific transmission[]." *Zander*, 794 F.3d at 1231. Nor did the government need to prove that the payment-file transfer was "at the heart of a scheme, nor necessary or even helpful for its success." *United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir. 2008). Instead, "it's

5

enough if [Lacona] set forces in motion which foreseeably would involve use of the wires," *Zander*, 794 F.3d at 1231 (cleaned up) (quoting *United States v. Mullins*, 613 F.3d 1273, 1281 (10th Cir. 2010)), and the proven payment-file transfer was "incident to the accomplishment of an essential part of [his] scheme," *Redcorn*, 528 F.3d at 738–39 (quoting *United States v. Mann*, 884 F.2d 532, 536 (10th Cir. 1989)).

Contrary to Lacona's passing suggestion otherwise, the evidence was more than sufficient to show that each time he applied for a loan, he set forces in motion which foreseeably involved the use of the wires, and that the transmission was incident to the success of his scheme. As the government argued at trial, Lacona knowingly submitted the loan applications to a bank located outside of Colorado via online portal. David Haagsma, an underwriting manager at TCF Bank, testified that TCF Bank provided "an online application" that prospective borrowers, including Lacona, used to submit applications. R. vol. 4, 552–53. He also explained that Lacona used DocuSign to submit follow-up documentation per the bank's normal procedure and that the bank communicated with Lacona via email regarding disbursement. Haagsma further testified that the location listed for TCF Bank on the promissory note Lacona received was in South Dakota. In other words, Lacona knowingly used digital mediums to communicate with an out-of-state bank. From this evidence, a jury could rationally find Lacona could have foreseen that he set in motion processes that would use interstate wires. A rational jury could also find that the SBA's fee payment to TCF Bank via interstate wire was incident to an essential part of Lacona's scheme to fraudulently acquire the loans. That's because if the SBA had not paid TCF Bank fees to process PPP loans, it is considerably

less likely that Lacona would have achieved his goal. In sum, the interstate-commerce evidence was sufficient for Lacona's wire-fraud convictions.

## II.    Constructive Amendment

Next, Lacona attacks his second wire-fraud conviction and his money-laundering conviction on constructive-amendment grounds. We begin with the second wire-fraud count, which was Count 2 in the indictment and stemmed from his second PPP loan application.

### A.    Second Wire-Fraud Conviction

Lacona properly preserved this constructive-amendment argument by raising it in his acquittal motion, and we thus review it de novo. *See United States v. Farr*, 536 F.3d 1174, 1179 (10th Cir. 2008). A constructive amendment of the indictment "occurs when the district court's instructions and the proof offered at trial broaden the indictment." *United States v. Honors*, 160 F.4th 1089, 1100 (10th Cir. 2025) (quoting *United States v. Koerber*, 10 F.4th 1083, 1116 (10th Cir. 2021)). It is not enough for additional facts to be introduced at trial that were not in the indictment; instead, to prevail on a constructive-amendment theory, the proponent must show that the proceedings "modif[ied] an essential element of the offense or raise[d] the possibility the defendant was convicted of an offense other than that charged in the indictment." *Id.* (quoting *United States v. DeChristopher*, 695 F.3d 1082, 1095 (10th Cir. 2012)).

Lacona argues that Count 2 was constructively amended because the government charged a unified scheme in the indictment, but he was convicted based on what was necessarily a second scheme. We have noted that "at some point the fraudulent [wire-

7

fraud] scheme must be complete." *Redcorn*, 528 F.3d at 739. We did so in the course of discussing "§ 1343's 'purpose' requirement [that] a wire transmission must be 'part of the execution of the scheme as conceived by the perpetrator at the time.'" *Id.* at 738 (quoting *Schmuck v. United States*, 489 U.S. 705, 715 (1989)). Consequently, in *Redcorn*, we held that wire communications occurring after the end of the charged scheme weren't for the purpose of the charged scheme. *Id.* at 738–39.

Extending that logic, Lacona argues that his scheme can't have been a single scheme and must have ended once he received the first PPP loan disbursement because Congress didn't approve the program providing a second chance to apply for PPP loans until December 2020, after the charged start date of his unified scheme. Thus, Lacona maintains that he can't have had a unified scheme to acquire *two* PPP loans when he began his scheme without predicting the future.

Whatever the merits of Lacona's underlying issue with the government's theory of the case, it is clear that the government never amended its theory, constructively or otherwise, over the course of proceedings. Throughout the case, the prosecution maintained that Lacona engaged in a single umbrella scheme to defraud. The indictment specifically charged a single scheme lasting from "at least April 2020, . . . until at least April 2021," involving two successful PPP applications and two unsuccessful EID applications. R. vol. 1, 24. Consistent with the indictment, the prosecution argued at closing that Lacona's fraudulent misstatements "took place between April 2020 and March of 2021," in "what was a very simple scheme" to lie "on two [PPP] loan applications[] and one application for an [EID] [l]oan." R. vol. 4,

8

729, 731. And that is how the jury was instructed: to find Lacona guilty, it had to find, beyond a reasonable doubt, that he "devised or intended to devise *a* scheme to defraud, *as alleged in the* [*i*]*ndictment*." R. vol. 1, 636 (emphasis added).

If anything, the prosecution narrowed its theory from the indictment in focusing on one, rather than two, EID loan applications. But in any event, "the mere 'addition or deletion of nonessential factual averments' is not a constructive amendment." *Honors*, 160 F.4th at 1100. Instead, it is a "simple variance." *Hunter v. State of N.M.*, 916 F.2d 595, 598 (10th Cir. 1990). In such a case, we will generally sustain convictions "as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." *United States v. Miller*, 471 U.S. 130, 136 (1985). Here, the proof set out—that Lacona had an overarching scheme to defraud based on two PPP loan applications and one unsuccessful EID loan application—indisputably corresponds to the wire-fraud offenses that were clearly set out in the indictment.

### B.    Money-Laundering Conviction

For this count, the government argues as a threshold matter that Lacona forfeited his constructive-amendment argument by failing to raise it below and waived it on appeal by failing to argue for plain error until his reply brief. Below, Lacona argued for a constructive amendment only as to Count 2; he challenged the money-laundering count only on the ground that the predicate wire-fraud counts were faulty. Contrary to his position on appeal, it's not sufficient to raise "the issue of constructive amendment . . . without limitation." Aplt. Br. 9. Instead, to put the district court on notice of the issue, Lacona had to connect his constructive-

9

amendment argument to the money-laundering count. Because he did not, he forfeited this argument, making it subject to plain-error review on appeal.

The government also contends that it put Lacona on notice of this preservation issue by raising it in the government's response to Lacona's request for release pending appeal. And because Lacona did not argue for plain error in his opening brief, the government argues he waived appellate review. *See United States v. Leffler*, 942 F.3d 1192, 1199–1200 (10th Cir. 2019) ("Defendant waived his [argument] by failing to argue for plain error in his opening brief."). But even if Lacona waived appellate review, we have the discretion to overlook waiver and apply plain-error review. *Id.* at 1198. We do so here, where Lacona did at least advance a plain-error argument in his reply brief. *See id.* at 1200 (noting that "our precedents give us discretion to consider a plain-error argument raised for the first time in a reply brief").

"A party seeking relief under the plain-error rubric bears the burden of showing '(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights.'" *United States v. Woodmore*, 135 F.4th 861, 873 (10th Cir. 2025) (cleaned up) (quoting *United States v. B.N.M.*, 107 F.4th

1152, 1170 (10th Cir. 2024)).[1] Lacona's constructive-amendment argument fails at the first prong of plain-error review.

Recall that a constructive amendment "occurs when the district court's instructions and the proof offered at trial broaden the indictment." *Honors*, 160 F.4th at 1100 (quoting *Koerber*, 10 F.4th at 1116). Lacona contends that occurred here because he was "convicted of money laundering based on interstate connections that were not alleged in the [i]ndictment." Aplt. Br. 12. Specifically, he argues that the indictment failed to allege that the Cadillac purchase was in or affected interstate commerce, but the government relied on that fact at trial.

Lacona's argument is unpersuasive. As background, a money-laundering charge under § 1957 requires the government to prove "the defendant (1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally derived property, (4) knowing that the property is derived from unlawful activity, and (5) that the property is, in fact, derived from specified unlawful activity." *United States v. Huff*, 641 F.3d 1228, 1230 (10th Cir. 2011) (quoting *United States v. Baum*, 555 F.3d 1129, 1131 (10th Cir. 2009)). The statute defines a "monetary transaction" as "the deposit, withdrawal, transfer, or

---

[1] If a party shows each factor is met, then we "may exercise discretion to correct the error if . . . it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Woodmore*, 135 F.4th at 873 (quoting *B.N.M.*, 107 F.4th at 1170).

exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." § 1957(f)(1).

Here, the indictment did not allege an interstate-commerce connection, but it did allege that Lacona engaged "in a monetary transaction in criminally derived property of a value greater than $10,000." R. vol. 1, 28. And it specifically pointed to "an official bank check drawn on [NFS]'s bank account with [TCF Bank] . . . in the amount of $67,704.13 to purchase a 2019 Cadillac CT6 from a Cadillac dealership in Colorado Springs, Colorado—such property being derived from a specified unlawful activity, that is, wire fraud." *Id.* Then, at trial, although the government did not mention interstate-commerce connections regarding the purchase of the Cadillac in its closing argument, it did argue that it had satisfied the monetary-transaction element—which by definition implicates interstate commerce. And it elicited trial testimony from an employee at the Cadillac dealership that the vehicle's title indicated the dealership had "purchased [it] out of Michigan from an auto auction." R. vol. 4, 185. Further, the district court instructed the jury that a "'monetary transaction' means the deposit, withdrawal, transfer, or exchange, *in or affecting interstate commerce*, of funds or a monetary instrument by, through, or to a financial institution," including "a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate commerce in any way or degree." R. vol. 1, 638 (emphasis added).

These facts show that the government never changed its theory as to the monetary-transaction element of the money-laundering charge and its attendant interstate-commerce links. Instead, the government alleged and proved an interstate-commerce

connection involved in the charged monetary transaction: the Cadillac's purchase with a check drawn against an account with an out-of-state bank (TCF Bank). Moreover, the vehicle moved in interstate commerce. Consequently, the government did not constructively amend the interstate-commerce link for purposes of the money-laundering charge.

Lacona relies heavily on *United States v. Adams*, 778 F.2d 1117 (5th Cir. 1985), to dispute that conclusion. But his analogy to *Adams* is strained at best. There, the indictment charged the defendant with giving a false name on a form to purchase firearms. *Id.* at 1120, 1124. Yet, at trial, the government introduced evidence, over objection, that Adams also gave a false address. *Id.* at 1120–21. So it was possible the jury convicted Adams on a theory of falsity that was not presented in the indictment. *Id.* at 1124. This case might be analogous if the indictment alleged a monetary transaction involving the purchase of a home or RV, for example, and then at trial the government proved another monetary transaction involving the Cadillac purchase. Yet the government alleged a monetary transaction—the Cadillac purchase—and then at trial proved that the monetary transaction provided the necessary interstate-commerce nexus. And the jury was instructed accordingly.

Lacona's reliance on *United States v. Miller*, 891 F.3d 1220 (10th Cir. 2018), is similarly unpersuasive. There, the indictment specified that the defendant violated 21 U.S.C. § 843(a) and (d) by making a specific false statement: answering no to a question about surrendering a state professional license. *Miller*, 891 F.3d at 1232. But at trial, witnesses testified that the defendant also made a second false statement: answering no to

13

a question about surrendering a federal controlled-substance registration. *Id.* Then the government's closing argument compounded the issue by arguing that the answers were "both falsehoods." *Id.* at 1233. Citing *Adams*, we found a clear and obvious constructive amendment requiring reversal. *Id.* at 1237–38. That's not what happened here. The government alleged and proved one monetary transaction in relation to the money-laundering count—the Cadillac purchase. Because the government's theory of the case remained the same from the indictment through the jury instructions, we reject Lacona's constructive-amendment argument.[2]

## III.    Prosecutorial Misconduct

Last, Lacona attacks his wire-fraud convictions on prosecutorial-misconduct grounds. He contends that the government "misconstrued and mischaracterized the testimony of a key witness" during closing argument "when [it] told the jury that the contract accountant who created employee payroll data for NFS . . . had 'records'

---

[2] To be sure, Lacona correctly points out that at least some indictments in this circuit explicitly allege an interstate-commerce link in money-laundering cases, rather than doing so implicitly by alleging a monetary transaction in criminally derived property. *See, e.g.*, Indictment, *United States v. Medlock*, No. 14-CR-0240, 2014 WL 10584751 (N.D. Okla. Feb. 3, 2014)); First Superseding Indictment, *United States v. Kingston*, No. 18-CR-00365, 2018 WL 8489475 (D. Utah Nov. 20, 2018). But it's not clear how that's relevant to a constructive-amendment argument. We further note that we have held that alleging a monetary transaction involving the "purchase of an automobile . . . manufactured in another state" is sufficient to confer jurisdiction in a money-laundering case. *See United States v. Lovett*, 964 F.2d 1029, 1038 (10th Cir. 1992). Moreover, Lacona points to no case, and we have uncovered none, where we found an allegation of a monetary transaction in criminally derived property insufficient to implicitly allege an interstate commerce link; as noted, a monetary transaction is, by definition, a transaction "in or affecting interstate or foreign commerce." 18 U.S.C. § 1957(f)(1).

14

that 'prove that Lacona lied on the PPP application.'" Aplt. Br. 19 (quoting R. vol. 4, 735). We reject this argument out of hand. First, Lacona concedes it is subject to plain-error review because he "did not object on this ground at closing argument." *Id.* at 21. And regardless, we find no prosecutorial misconduct. Showing prosecutorial misconduct through statements made in closing argument requires that (1) the comments were improper and (2) the improper comments infected the trial with unfairness through their likely effect on the jury's verdict. *See United States v. Holt*, 161 F.4th 1253, 1266 (10th Cir. 2025). Here, the challenged statement wasn't improper.

In full, the prosecutor stated that the accountant's "*records* prove that Lacona lied on the PPP application, when he claimed almost $60,000 a month in payroll." R. vol. 4, 735 (emphasis added). That statement clearly refers to records the accountant held or created—not the accountant's testimony. More specifically, the prosecutor's statement summarized trial evidence indicating that the accountant's payroll records showed NFS didn't pay employees until May 28, 2020—in sharp contrast to Lacona's representations in his loan applications.

Lacona nevertheless argues that the accountant testified to making mistakes and that he was not instructed to commit fraud, suggesting that the government's statements amounted to an unsupported assertion that the accountant's records were flawless or that Lacona instructed the accountant to commit fraud. That is hardly the case. Again, the prosecutor referenced what the *records* showed, not the accountant's testimony. Nor did the prosecutor imply an instruction to commit fraud.

As a final matter, Lacona argues that his money-laundering conviction should

15

be vacated because of the purported problems with his wire-fraud convictions. Finding no errors in Lacona's wire-fraud convictions, we reject this argument.[3]

**Conclusion**

A rational jury could find, beyond reasonable doubt, that the government proved an interstate wire transmission incident to Lacona's scheme and that Lacona could have foreseen interstate wire transmissions. The government did not constructively amend any of the counts, and the prosecutor did not commit misconduct in referring to the accountant's records. We affirm Lacona's convictions.

Entered for the Court


Nancy L. Moritz
Circuit Judge

---

[3] *Contrast United States v. Lake*, 472 F.3d 1247, 1250 (10th Cir. 2007) (reversing money-laundering conviction when there was insufficient evidence of wire fraud and thus insufficient evidence that funds were criminally derived), *with United States v. Irvin*, 682 F.3d 1254, 1268 (10th Cir. 2012) (upholding money-laundering convictions where there was sufficient evidence that funds used were criminally derived from bank fraud).

16